UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| KATHLEEN HICKEY, | : | CIVIL NO.: 4:18-cv-01793 |
| *As the Administratrix of Estate of* | : | |
| *Michael A. Serrano, Deceased,* | : | (Magistrate Judge Schwab) |
| *and in her Own Right*, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| KAREN MERRITT-SCULLY, | : | |
| MICHAEL MOCLOCK, | : | |
| RENEE KERR. | : | |
| | : | |
| Defendants. | : | |

## <u>MEMORANDUM OPINION</u>

### I. Introduction.

Plaintiff Kathleen Hickey ("Hickey") brings this action individually and as Administratrix of the estate of her deceased son, Michael A. Serrano ("Serrano"), who passed away on May 29, 2016, while incarcerated at State Correctional Institute Coal Township ("SCI Coal Twp").  Hickey asserts civil rights and professional negligence claims against defendants Michael Moclock, M.D. ("Dr. Moclock"), Health Care Administrator, Karen Merritt-Scully ("Merritt-Scully") and Renee Kerr, LPN ("Nurse Kerr"), and requests damages pursuant to Pennsylvania's Wrongful Death Act, 42 Pa. C.S.A. § 8301, and Pennsylvania's

Survival Act, 42 Pa. C.S.A. § 8302.[1]  Presently before us are two motions for

summary judgment, one filed by Dr. Moclock, and the other jointly filed by

Merritt-Scully and Nurse Kerr.  Because complex factual and medical issues

permeate this case, we will grant in part and deny in part both motions for

summary judgment.


## II.  Background and Procedural History.

Hickey began this action by filing a praecipe for writ of summons in the

Northumberland County Court of Common Pleas on May 25, 2018. *Doc. 1-1*.

Hickey initially named as the defendants Thomas McGinley ("McGinley"),

Merritt-Scully, Dr. Moclock, Kevin Meitzler, RN ("Meitzler"), Denice Austeel,

RN ("Austeel"), Brian Davis, PA-C ("Davis"), and Nurse Kerr. *Id.* at 3-4.  On

September 12, 2018, Dr. Moclock and Davis filed a notice of removal, and this

action was removed to the United States District Court for the Middle District of

Pennsylvania. *Doc. 1*.  Dr. Moclock filed a motion to dismiss Hickey's complaint,

and all defendants filed an answer to the complaint on November 19, 2018. *Docs.*

---

[1] Under Pennsylvania law, "wrongful death and survival actions are not substantive causes of action; rather, they provide a vehicle through which plaintiffs can recover for unlawful conduct that results in death." *Johnson v. City of Philadelphia*, 105 F.Supp.3d 474, 483 (E.D. Pa. 2015) (citing *Sullivan v. Warminster Twp.*, 765 F.Supp.2d 687, 707 (E.D. Pa. 2011)); *see also* 42 Pa. Cons. Stat. §§ 8301, 8302.

*4*, *13*.  Judge Brann granted Dr. Moclock's motion to dismiss, and Hickey filed the operative amended complaint on December 21, 2018, which names as the defendants Dr. Moclock, Merritt-Scully, and Nurse Kerr. *Docs. 15*, *16*.  Hickey alleges that the defendants violated Serrano's constitutional rights through their deliberate indifference to his medical conditions, in violation of the Eighth Amendment to the United States Constitution.  Hickey also alleges that the defendants are liable for professional negligence which resulted in Serrano's death. *Doc. 16* at 26-30, 38-56.

By way of background, Hickey alleges in her amended complaint that Serrano was shot in the face and head in 2008, which caused a traumatic brain injury and multiple health issues including seizures. *Id.* at 21.  She alleges that Serrano was sentenced to prison on November 7, 2011, was transferred along with his medical records through multiple different prisons, and was ultimately incarcerated at SCI Coal Twp. on November 23, 2015. *Id.* at 22-28.

Counts One, Two and Three of the amended compliant assert state law professional negligence/medical malpractice ("professional negligence") claims against Dr. Moclock, Merritt-Scully, and Nurse Kerr respectively.  Counts Four and Five assert claims against Dr. Moclock and Merritt-Scully respectively under

§ 1983 for Eighth Amendment deliberate indifference and failure to train, supervise and discipline claims.  Count six asserts an Eighth Amendment deliberate indifference claim against Nurse Kerr.

The defendants filed their answers to the amended complaint. *Docs. 19-20*. Hickey filed a notice of voluntary dismissal for, and the court ordered the dismissal of, defendants McGinley, Meitzler, Austeel, and Davis. *Docs. 21-22*.  The remaining parties consented to magistrate judge jurisdiction pursuant to 28 U.S.C. § 636 (c), and the case was referred to the undersigned. *Docs. 26*, *28*.

On May 21, 2020, the parties filed three motions for summary judgment. *Docs. 43* (Dr. Moclock), *45* (Nurse Kerr and Merritt-Scully), *46* (Hickey).  The three defendants filed a joint statement of material facts along with exhibits in support of their motions for summary judgment. *Doc. 44*.  Hickey filed a brief in support of her motion for summary judgment containing her statement of material facts, along with exhibits.[2] *Doc. 49*.  Hickey later filed a supplemental appendix of exhibits. *Doc. 62*.  Dr. Moclock filed a brief in support of his motion for summary judgment, as did Merritt-Scully and Nurse Kerr. *Docs. 51*, *53*.  Dr. Moclock also

---

[2] Hickey did not file a separate statement of material facts in support of her motion for summary judgment, and instead opted to include a discussion of the facts in her brief in support of her motion for summary judgment. *See doc. 49* at 6-27.

filed a brief in opposition to Hickey's motion for summary judgment, as did Merritt-Scully and Nurse Kerr. *Docs. 58, 59.* The three defendants filed a joint response to the statement of material facts contained in Hickey's brief in support of her motion for summary judgment. *Doc. 60.* Hickey filed briefs in opposition[3] to Merritt-Scully and Nurse Kerr's motion for summary judgment and to Dr. Moclock's motion for summary judgment. *Docs. 63-64.* Dr. Moclock filed a reply brief in support of his motion for summary judgment, and Merritt-Scully and Nurse Kerr filed a reply brief in support of their motion for summary judgment. *Docs. 65-66.* Hickey did not file any reply briefs, and the time to do so has since passed.

On March 12, 2021, we entered an order denying Hickey's motion for summary judgment on the basis that she failed to comply with Local Rule 56.1, and we further ordered her to file an appropriate response to the defendants' joint statement of material facts in accordance with Local Rule 56.1. *Doc. 67.* Hickey filed her response to the defendants' joint statement of material facts. *Doc. 68.* Thus, the defendants' two motions for summary judgment are ripe for decision. We separately analyze each motion for summary judgment below.

---

[3] Hickey also failed to file a separate response to the defendants' joint statement of material facts. Instead, each of Hickey's briefs in opposition to the defendants' motions for summary judgment referenced a section of Hickey's brief in support of her motion for summary judgment. *See doc. 64-1* at 6; *doc. 63-1* at 7.

## III.  Summary Judgment Standards.

The defendants move for summary judgment under Rule 56(a) of the Federal Rules of Civil Procedure, which provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "Through summary adjudication the court may dispose of those claims that do not present a 'genuine dispute as to any material fact' and for which a jury trial would be an empty and unnecessary formality." *Goudy-Bachman v. U.S. Dep't of Health & Human Servs.*, 811 F. Supp. 2d 1086, 1091 (M.D. Pa. 2011) (quoting Fed. R. Civ. P. 56(a)).

The moving party bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the record that demonstrate the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  With respect to an issue on which the nonmoving party bears the burden of proof, the moving party may discharge that burden by "'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325.

Once the moving party has met its burden, the nonmoving party may not rest upon the mere allegations or denials of its pleading; rather, the nonmoving party must show a genuine dispute by "citing to particular parts of materials in the

record, including depositions, documents, electronically stored information,
affidavits or declarations, stipulations (including those made for purposes of the
motion only), admissions, interrogatory answers, or other materials" or "showing
that the materials cited do not establish the absence . . . of a genuine dispute." Fed.
R. Civ. P. 56(c).  If the nonmoving party "fails to make a showing sufficient to
establish the existence of an element essential to that party's case, and on which
that party will bear the burden at trial," summary judgment is appropriate. *Celotex*,
477 U.S. at 322.

Summary judgment is also appropriate if the nonmoving party provides
merely colorable, conclusory, or speculative evidence. *Anderson v. Liberty Lobby,
Inc.*, 477 U.S. 242, 249 (1986).  There must be more than a scintilla of evidence
supporting the nonmoving party and more than some metaphysical doubt as to the
material facts. *Id.* at 252.  "Where the record taken as a whole could not lead a
rational trier of fact to find for the non-moving party, there is no 'genuine issue for
trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586
(1986).

The substantive law identifies which facts are material, and "[o]nly disputes
over facts that might affect the outcome of the suit under the governing law will
properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248.  A
dispute about a material fact is genuine only if there is enough evidence to allow a

reasonable factfinder to return a verdict for the non-moving party. *Id.* at 248-49.

When "faced with a summary judgment motion, the court must view the facts 'in

the light most favorable to the nonmoving party.'" *N.A.A.C.P. v. N. Hudson Reg'l*

*Fire & Rescue*, 665 F.3d 464, 475 (3d Cir. 2011) (quoting *Scott v. Harris*, 550 U.S.

372, 380 (2007)).

At the summary judgment stage, the judge's function is not to weigh the

evidence or to determine the truth of the matter; rather it is to determine whether

there is a genuine issue for trial. *Anderson*, 477 U.S. at 249.  The proper inquiry of

the court "is the threshold inquiry of determining whether there is the need for a

trial—whether, in other words, there are any genuine factual issues that properly

can be resolved only by a finder of fact because they may reasonably be resolved

in favor of either party." *Id.* at 250.

Summary judgment is warranted, after adequate time for discovery, against a

party who fails to make a showing sufficient to establish the existence of an

element essential to that party's case and on which that party will bear the burden

of proof at trial. *Celotex*, 477 U.S. at 322.  "Under such circumstances, 'there can

be no genuine issue as to any material fact, since a complete failure of proof

concerning an essential element of the nonmoving party's case necessarily renders

all other facts immaterial.'" *Anderson v. Consol. Rail Corp.*, 297 F.3d 242, 247 (3d

Cir. 2002) (quoting *Celotex*, 477 U.S. at 323).  "[S]ummary judgment is essentially

'put up or shut up' time for the non-moving party: the non-moving party must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument." *Berckeley Inv. Grp., Ltd. v. Colkitt*, 455 F.3d 195, 201 (3d Cir. 2006).

## IV.  Material Facts.

The following facts are the material facts for purposes of the pending summary judgment motions.[4]  On September 21, 2008, Serrano was critically injured when he was shot in the head, after which he began having seizures.[5] *Doc.*

---

[4] Local Rule 56.1 requires that a motion for summary judgment pursuant to Federal Rule of Civil Procedure 56 be supported "by a separate, short, and concise statement of the material facts, in numbered paragraphs, as to which the moving party contends there is no genuine issue to be tried." M.D. PA. L.R. 56.1.  A party opposing a motion for summary judgment must file a separate statement of material facts, responding to the numbered paragraphs set forth in the moving party's statement and identifying genuine issues to be tried. *Id*.  Here, Hickey's Response to Defendants' Joint Statement of Material Facts (*doc. 68*) is on the whole improper.  Although she does admit some facts, rather than properly disputing a fact in the defendants' joint statement, Hickey explains why such facts are immaterial, or she presents argument regarding the facts in the context of the substantive claims raised in the case, or both.  Accordingly, the Court is constrained to cite to defendants' joint statement of material facts and address Hickey's issues to the extent they are raised in her brief.  Finally, as part of our review, we have scrutinized the parties' Rule 56 documentation and independently considered the entire record.

[5] All parties cite to the long factual history regarding Serrano's medical and seizure issues.  While creating a backdrop for the claims in this case, much of this history is not relevant to the claims at issue in the motion for summary judgment

*44* at ¶¶ 3-4. Serrano suffered seizures on May 8, June 17, early November, and December 12, 2009; late September and October 4, 2010; early March and June 9, 2011. *Id.* at ¶¶ 6-7, 10-11, 14-15, 17. At his October 4, 2010 hospitalization following a seizure, Serrano reported that a few weeks earlier Serrano's neurologist increased his dosage of Trileptal, an anticonvulsant used to treat seizures, but that he continued to experience seizures. *Id.* at ¶ 15.

Serrano arrived at State Correctional Institute Graterford on November 7, 2011, and he completed a "symptoms review" in which he mentioned his seizures and drug use, as well as his 2008 gunshot wound to the head. *Id.* at ¶ 18. He also reported that he took 1050 mg of Trileptal twice a day and that he was born with a heart murmur. *Id.* On November 21, 2011, Serrano was transferred to State Correctional Institute Camp Hill. *Id.* at ¶ 22. On February 13, 2012, Serrano was seen by Dr. Gandy who determined that the examination was normal, cancelled Serrano's "Keep on Person"[6] medication status, and ordered that Serrano was to

---

before us. Also, defendants include many facts regarding Serrano's grievance history and his many requests for snack bags. We note these facts and understand the substantive reasons for their inclusion in the statement of material facts. We, however, will confine our discussion to the relevant material facts bearing on the claims raised and our resolution thereof.

[6] Per Dr. Moclock, "Keep on Person" means the inmate is permitted to keep the medication in his cell. *See doc. 51* at 3.

continue taking Trileptal. *Id.* at ¶ 24.  On March 10, 2012, Serrano had a seizure in his cell and was given Trileptal. *Id.* at ¶ 26.  The doctor noted that Serrano "was not taking his Trileptal," and he ordered a daily neurological check for two days. *Id.* at ¶ 27.

On April 17, 2021, the doctor assessed Serrano and increased his Trileptal dose, and he ordered Serrano's serum Trileptal levels to be tested in order to determine whether he was taking his medicine. *Id.* at ¶ 41.  On April 17, 2012, Serrano was caught surreptitiously concealing his medication in his mouth and bringing it back to his cell—i.e., "cheeking" his pills—and pills were found in his cell. *Id.* at ¶ 42.  Accordingly, on April 20, 2012, a physician assistant wrote that Serrano cheeked his Trileptal and ordered that his medication should be crushed to avoid abuse. *Id.* at ¶ 43.  The doctor followed up with Serrano on April 30, 2012, noted no further seizures, and noted Trileptal levels at the low end of the test range. *Id.* at ¶ 44.  The doctor concluded that Serrano's seizures were adequately controlled and that his current Trileptal dosage was adequate. *Id.*

On June 1, 2012, Serrano was transferred to State Correctional Institute Houtzdale and joined general housing with a bottom tier, bottom bunk assignment. *Id.* at ¶ 45.  Serrano went to sick call six times in June to request a snack bag, but his requests were denied because his weight was normal, and his seizure disorder with compliance issues was noted. *Id.* at ¶ 46.  On September 11, 2012, Dr.

11

Mohammad Naji ("Dr. Naji") at the Seizure Chronic Care Clinic examined Serrano. *Id.* at ¶ 47.  Dr. Naji noted that the examination was unremarkable, found Serrano's seizure disorder to be stable, and did not alter his medications. *Id.*  On February 18, 2013, Serrano was again caught keeping medications in his cell. *Id.* at ¶ 49.  Dr. Naji discontinued Serrano's Trileptal because he was "hiding it and doesn't take it," and Serrano did not receive any Trileptal afterwards. *Id.* at ¶ 50.

On March 13, 2013, Serrano complained that he felt like he was going to have a seizure, after which Patrick Nagle, PA-C ("Nagle") noted that Dr. Naji discontinued Serrano's medication. *Id.* at ¶ 52.  Nagle discussed Serrano's medication with Dr. Naji, and Dr. Naji "was adamant that [Serrano] was not to be restarted on seizure medications." *Id.*  Serrano reported that he thought he would "catch" a seizure on March 26, 2013, but Maria Leahy, PA-C "found no evidence of recent seizure activity and suspected that [Serrano] was being manipulative." *Id.* at ¶ 53.  On April 9, 2013, Dr. Naji wrote an order removing Serrano from the seizure clinic and wrote that it was because Serrano was not taking seizure medication since he was hoarding it. *Id.* at ¶ 54.  On October 1, 2014, Serrano reported as part of an initial reception mental health questionnaire that he hadn't "had seizures in years—history of grand mal seizures." *Id.* at ¶ 69.[7]

---

[7] Hickey notes that this is an "undated, unsigned, handwritten note," but does not dispute its factual contents. *Doc. 68* at 42; *see also doc. 44-11* at 27.

On February 4, 2015, Serrano was transferred to State Correctional Institute Fayette. *Id.* at ¶ 75.  The next day, after reviewing his chart, A. Maskin, CRNP, noted that Serrano had a history of seizures, but was not currently on seizure medication, and deemed Serrano to be medically stable. *Id.*  Serrano went to the Seizure Chronic Care Clinic on February 23, 2015, and he reported that his seizures began after he was shot in the head, but that he did not have a seizure in the past two years. *Id.* at ¶ 77.  The notes from the February 23 visit also reflect that Serrano had not taken Trileptal since February of 2013 because he hoarded the pills, and Dawn Chowden PA-C then ordered Serrano discontinued from the Seizure Chronic Care Clinic. *Id.*

Serrano was transferred to SCI Coal Twp. on November 23, 2015, and was assessed by psychology without any complaints noted. *Id.* at ¶ 86.  On November 24, 2015, Nicholle Boguslaw, PA-C completed an IST/MAC form[8], used to identify medically necessary devices or accommodations for an inmate, and noted "No seizures ≥ 2 years.  No RX since 2013.  Had seizure in 2008 2° [secondary] to GSW [gunshot wound] plate in his head." *Id.* at ¶ 87.  Whether Dr. Moclock

---

[8]  Per the defendants' "[a]n IST/MAC is a form completed by the medical department to identify any medically approved devices or medically necessary accommodations for an inmate, such as work limitations, exercise limitations, and housing accommodations."  *Doc. 44* at ¶ 87, n. 5.

countersigned these notes is disputed. *Id.*[9]  On November 30, 2015, Serrano was seen by psychology and reported no medical concerns.  *Id.* at ¶ 88.  On December 10, 2015, Brian Davis PA-C ("Davis") wrote, as part of a Seizure Chronic Care Clinic form that Serrano was "[s]cheduled for seizure clinic but has not been on any med for > 2 years.  Also no [seizure] activity for > 2 years.  D/c [discontinued] from chronic clinic.  No active seizure [disorder]." *Id.* at ¶ 91.  Serrano also saw psychiatry the same day but had no complaints about seizures. *Id.* at ¶ 92.  On December 15, 2015, psychiatry and psychology saw Serrano again where he complained about sleeplessness, anxiety, and depression. *Id.* at ¶ 95-96.  Serrano did not complain when psychology assessed him again on December 17, 2015. *Id.* at ¶ 98.  Serrano saw Davis at sick call on December 22, 2015, for a right foot injury, was prescribed antibiotic ointment, and did not mention any seizure concerns. *Id.* at ¶ 99.

Both psychology and psychiatry saw Serrano on January 5, 2016, where Serrano reported anxiety but no other medical concerns. *Id.* at ¶ 101.  Later that day, Serrano was found "verbally unresponsive" on his cell floor by corrections officers, and Kevin Meitzler, RN ("Meitzler") arrived to assess Serrano. *Id.* at

---

[9] Hickey disputes that Dr. Moclock's signature is legible. *Doc. 68* at ¶ 87.

¶ 102.  Serrano's evaluation was normal, except for some bruising under his right eye and his spine, which Serrano stated were "really old." *Id.*  Serrano further denied any pain or injury and told Meitzler that he fell. *Id.*  Meitzler reported his findings to Dr. Moclock, and Dr. Moclock ordered that Serrano be put under 23-hour observation in the infirmary with neurological checks and vitals monitoring. *Id.* at ¶ 103.  Dr. Moclock acknowledged at his deposition that Serrano could have fallen, ingested, or overdosed on medication, or suffered a seizure. *Id.* at ¶ 104.  In the infirmary, Serrano did not raise any medical complaints or make any requests, and his examinations were normal. *Id.* at ¶ 105.  Similarly, on January 6, 2016, Serrano made no complaints and showed neither neurological defects nor seizure activity. *Id.* at ¶ 106.  Dr. Moclock also saw Serrano on January 6, 2016, and noted no neurological deficits. *Id.* at ¶ 107.  Dr. Moclock found no neurological source for Serrano's episode, found Serrano to be normal on examination, and did not administer Trileptal "because there was no evidence that [Serrano] suffered a seizure that week." *Id.*  Serrano was discharged from the infirmary on January 7, 2016, having made no medical complaints and appearing normal on evaluation. *Id.* at ¶ 108.

Serrano underwent several examinations and evaluations throughout January and February of 2016, during which he made neither complaints about his health nor mention of seizures. *Id.* at ¶¶ 109-23.  Serrano did not mention concerns about

seizures when he spoke with the psychologist on March 11, March 21, or March 23, 2016. *Id.* at ¶¶ 130-31.  On March 31, 2016 Serrano saw Davis to complain about dizziness, and Davis ordered labs, which were normal, to rule out a metabolic cause for Serrano's alleged weight loss. *Id.* at ¶ 133.  Serrano reported to psychology on April 18, 2016, that he was doing okay and offered no complaints. *Id.* at ¶ 135.

On April 20, 2016, Nurse Kerr "responded to a call from security to come to the RHU in response to an alleged seizure." *Id.* at ¶ 136.  Nurse Kerr's progress note (*doc. 44-2* at 28-29) noted that she did not remove Serrano from his cell, but she took his vitals by having him reach outside the wicket. *Id.*  She further noted that Serrano was responsive, appeared normal, had equal and reactive pupils, was uninjured, and was not incontinent. *Id.*  Nurse Kerr noted Serrano's multiple diagnoses, which she "received" from the computer. *Id.*  The diagnoses in the computer included laceration, gastritis, adjustment disorder, impulse control and conduct disorder, antisocial personality disorder, insomnia disorder, and eczema. *Id.*  The diagnoses in the computer but did not list seizure disorder. *Id.*  She testified that she reviewed Serrano's Electronic Medical Record ("EMR") and his chart before writing her note, and testified that "the fact that she did not list seizures in his history indicated to her that this was not contained within the EMR or the chart." *Id.* at ¶ 139.  Nurse Kerr further testified that she arrived to assess

16

Serrano at 7:10 a.m. for an alleged seizure at 7:00 a.m., and that she concluded after examining and speaking with Serrano that he did not have a seizure that morning. *Id.*

On April 21, 2016, Dr. Moclock and Merritt-Scully reviewed and signed Nurse Kerr's note. *Id.* at ¶ 136. Merritt-Scully was the Corrections Healthcare Administrator ("CHCA") at SCI Coal Twp. during Serrano's incarceration and was "responsible for managerial and administrative functions of the Medical Department." *Id.* at ¶ 137. While Merritt-Scully oversaw the administrative functions of Nurse Kerr, Nurse Kerr reported to the SCI Coal Twp. nursing supervisor. *Id.* Merritt-Scully's purpose in reviewing Nurse Kerr's note "was to make sure that the safety of the patient is assured," and she testified that she saw nothing in the note indicating that Serrano was in harm's way. *Id.* Dr. Moclock's purpose in reviewing Nurse Kerr's note was "simply to review the collection of information from the incident, not to check its accuracy." *Id.* at ¶ 138. Regardless, Dr. Moclock reviewed the note but "did not see any medical findings consistent with a recent seizure . . . [and] he was certain that if a seizure had been witnessed, it would have been documented." *Id.* Serrano made no mention of seizures during his April 26, 2016, psychiatry appointment. *Id.* at ¶ 140.

On April 29, 2016, Serrano was again caught by security hoarding pills in his cell, and Sharon Graff, CRNP of psychiatry discontinued Serrano's Buspar,

Melatonin, and Zoloft prescriptions. *Id.* at ¶ 141.  On May 3, 2016, Serrano again sought a snack bag, and Davis denied the request as Serrano was not malnourished. *Id.* at ¶ 143.  Serrano did not mention anything regarding seizures to Davis. *Id.*  On May 13, 2015, Hickey visited Serrano, and Serrano allegedly told Hickey that he "suffered from three seizures in the past two weeks" and was not given seizure medication—he had not told her that his seizure medication was discontinued years ago. *Id.* at ¶¶ 145-46.  According to Hickey, she called the prison and twice spoke with Merritt-Scully, who assured her that Serrano would receive his medication. *Id.* at ¶ 147.  Merritt-Scully does not recall speaking with Dr. Moclock about Serrano or otherwise relaying Hickey's message. *Id.* at ¶ 148.

On May 29, 2016, at 6:20 a.m., a corrections officer counted the inmates and saw Serrano standing at his cell door. *Id.* at ¶ 149.  At 6:45 a.m., Serrano "was found unresponsive in his cell." *Id.* at ¶ 150.  Medical staff attempted to resuscitate Serrano to no avail, and Serrano was pronounced dead. *Id.* at ¶ 152.

## V.    Discussion.

### A. Professional Negligence Claims.

Here, Hickey sues all the defendants for professional negligence asserting that each breached the applicable standard of care in treating and managing Serrano's medical care and, thus, caused his death.  In Pennsylvania, medical

negligence, or medical malpractice, is defined as "the unwarranted departure from

generally accepted standards of medical practice resulting in injury to a patient,

including all liability-producing conduct arising from the rendition of professional

medical services." *Toogood v. Owen J. Rogal, D.D.S., P.C.*, 824 A.2d 1140, 1145

(Pa. 2003) (citing *Hodgson v. Bigelow*, 7 A.2d 338 (Pa. 1939)).  Under

Pennsylvania law in order to establish a cause of action for professional

negligence, the plaintiff must prove the following:

> (1) a duty owed by the physician to the patient (2) a breach of
> duty from the physician to the patient (3) that the breach of duty
> was the proximate cause of, or a substantial factor in, bringing
> about the harm suffered by the patient, and (4) damages
> suffered by the patient that were a direct result of that harm.

*Mitzelfelt v. Kamrin*, 584 A.2d 888, 891 (Pa. 1990).  To satisfy the burden of

providing a medical malpractice claim the plaintiff "is also required to present an

expert witness who will testify, to a reasonable degree of medical certainty, that the

acts of the physician deviated from good and acceptable medical standards, and

that such deviation was the proximate cause of the harm suffered." *Id.* at 892

(citing *Brannan v. Lakenau Hosp.*, 417 A.2d 196 (Pa. 1980)); *see also Toogood*,

824 A.2d at 1145 ("[A] plaintiff must present medical expert testimony to establish

that the care and treatment of the plaintiff by the defendant fell short of the

required standard of care and that the breach proximately caused the plaintiff's

injury.").

As to causation "'[w]hat the expert [report] must demonstrate is that the negligence of the defendant either proximately caused the plaintiff's harm, or increased the risk of its occurrence.'" *Grossman v. Barke*, 868 A.2d 561, 572 (Pa. Super. Ct. 2005) (quoting *Watkins v. Hosp. of the Univ. of Pa.*, 737 A.2d 263, 267 (Pa. Super. Ct. 1999)); *see also Vicari v. Spiegel*, 936 A.2d 503, 510 (Pa. Super. Ct. 2007) ("Additionally, a 'medical opinion need only demonstrate, with a reasonable degree of medical certainty, that a defendant's conduct increased the risk of the harm actually sustained, and the jury then must decide whether that conduct was a substantial factor in bringing about the harm.'") (quoting *Smith v. Grab*, 705 A.2d 894, 899 (Pa. Super. Ct. 1997)).

The parties vigorously debate defendants' liability on this claim in their briefs. The record also contains several expert reports opining, *inter alia*, on whether the defendants violated professional standards of care in their treatment of Serrano. Such reports are summarized as follows:

**<u>Plaintiff's Expert Reports</u>.**

Expert Report of Adriana Olar, M.D., M.Sc. – reviewing the autopsy report and opining that Serrano's death was related to a seizure disorder. *Doc. 49-12*.

Expert Report of Danielle A. Becker, M.D., M.S. – opining that Dr. Moclock, Merritt-Scully and Nurse Kerr deviated from the acceptable standards of care. *Doc. 49-11*.

Expert Report of Andrea C. Reischerl PMHCNS-BC, CCHP, CPAI, LNC – opining that Nurse Kerr functioned outside the scope of her practice as an LPN. *Doc. 68-9, 58-2.*

**Defendants' Expert Reports**.

Expert Report of Arthur H. McTighe, M.D. – opining that based on his review there is no evidence to suggest that Serrano's death was the result of an epileptic seizure. *Doc. 51-2.*

Expert Report of John Khoury, M.D. – opining that Dr. Moclock acted within the standard of care in not prescribing anti-epileptic medication to Serrano. *Doc. 65 at 14-23.*

**Autopsy Report**.

Autopsy Report of Michael W. Johnson, M.D., Ph.D – opining that Serrano's death was possibly due to complications of a remote gunshot wound to the head. *Doc. 49-15.*

Having carefully reviewed the record, including the expert reports, we conclude that the numerous factual disputes preclude summary judgment in favor of all of the defendants on Hickey's professional negligence claims. These disputes regarding the respective standards of care and whether such were breached involve factual determinations as to the credibility of these competing experts' views, determinations that are properly left for the jury to decide, not this court. We will therefore deny summary judgment to defendants on these claims.

### B. Eighth Amendment Claims.

Hickey's federal claims are brought pursuant to § 1983.  To state a viable § 1983 claim, a plaintiff must plead two essential elements: 1) that the conduct complained of was committed by a person acting under color of state law, and 2) that said conduct deprived the plaintiff of a right, privilege, or immunity secured by the Constitution or laws of the United States. *Natale v. Camden Cty. Corr. Facility*, 318 F.3d 575, 580-81 (3d Cir. 2003).  Moreover, for a § 1983 claim to survive a motion to dismiss, the plaintiff must sufficiently allege that the defendant was personally involved in the act or acts that the plaintiff claims violated his rights. *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988); *see also Chavarriaga v. N.J. Dep't of Corr.*, 806 F.3d 210, 222 (3d Cir. 2015).  Individual liability can be imposed under 42 U.S.C. § 1983 only if the state actor played an "affirmative part" in the alleged misconduct and "cannot be predicated solely on the operation of respondeat superior." *Evancho v. Fisher*, 423 F.3d 347, 353 (3d Cir. 2005) (quoting *Rode*, 845 F.2d at 1207); *Sutton v. Rasheed*, 323 F.3d 236, 249-50 (3d Cir. 2003).  The personal involvement of a defendant in a §1983 action may be shown "through allegations of personal direction or of actual knowledge and acquiescence." *Argueta v. U.S. Immigration & Customs Enf't*, 643 F.3d 60, 71 (3d Cir. 2011) (quoting *Rode*, 845 F.2d at 1207).  Such allegations, however, must be made with appropriate particularity in that a complaint must allege the

22

particulars of "conduct, time, place, and persons responsible." *Evancho*, 423 F.3d at 354; *Rode*, 845 F.2d at 1207-08.  Alleging a mere hypothesis that an individual defendant had personal knowledge or involvement in depriving the plaintiff of his rights is insufficient to establish personal involvement. *Rode*, 845 F.2d at 1208. Moreover, a defendant "cannot be held responsible for a constitutional violation which he or she neither participated in nor approved." *C.H. ex rel. Z.H. v. Olivia*, 226 F.3d 198, 201-02 (3d Cir. 2000).  Allegations that a supervisor "had constructive knowledge of a subordinate's unconstitutional conduct simply because of his role as a supervisor" do not suffice. *Broadwater v. Fow*, 945 F.Supp.2d 574, 588 (M.D. Pa. 2013) (citing *C.H. ex rel. Z.H.*, 226 F.3d at 202).

"The Eighth Amendment, made applicable to the States through the Fourteenth Amendment, prohibits the infliction of 'cruel and unusual punishments.'" *Glossip v. Gross*, 576 U.S. 863, 876 (2015).  "An inmate must rely on prison authorities to treat his medical needs; if the authorities fail to do so, those needs will not be met." *Estelle v. Gamble*, 429 U.S. 97, 103 (1976).  In order for a plaintiff to allege a viable Eighth Amendment medical claim, he must allege facts from which it can reasonably be inferred that the defendant acted with deliberate indifference to his serious medical needs. *Id.* at 104; *see also Groman v. Township of Manalapan,* 47 F.3d 628, 637 (3d Cir. 1995) ("Failure to provide medical care to a person in custody can rise to the level of a constitutional violation under

23

§ 1983 only if that failure rises to the level of deliberate indifference to that person's serious medical needs.").

In order to prove that his Eighth Amendment rights have been violated, a plaintiff must make both an objective and a subjective showing in order to impose liability on a defendant.  Objectively, a plaintiff must show that his deprivation was sufficiently serious to rise to the level of an Eighth Amendment violation. *Pearson v. Prison Health Serv.*, 850 F.3d 526, 534 (3d Cir. 2017) (quoting *Rouse v. Plantier*, 182 F.3d 192, 197 (3d Cir. 1999)); *Chavarriaga v. New Jersey Dep't of Corrections*, 806 F.3d 210 (3d Cir. 2015).  A medical need is serious if it "has been diagnosed by a physician as requiring treatment" or if it "is so obvious that a lay person would easily recognize the necessity for a doctor's attention." *Monmouth Cnty. Corr. Institutional Inmates v. Lanzaro*, 834 F.2d 326, 347 (3d Cir. 1987) (quoting *Pace v. Fauver*, 479 F.Supp. 456, 458 (D.N.J. 1979), *aff'd,* 649 F.2d 860 (3d Cir. 1981) (table)).  Additionally, "if 'unnecessary and wanton infliction of pain' results as a consequence of denial or delay in the provision of adequate medical care, the medical need is of the serious nature contemplated by the eighth amendment." *Id.* (quoting *Estelle,* 429 U.S. at 103).  Further, "where denial or delay causes an inmate to suffer a life-long handicap or permanent loss, the medical need is considered serious." *Id.*

24

Subjectively, a plaintiff must show that the defendant was deliberately indifferent to his medical needs. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994).

> But to demonstrate a defendant's deliberate indifference an inmate need not show that the defendant intentionally sought to cause the inmate harm or acted with knowledge that harm to the inmate probably would result from the defendant's act or failure to act. Though purposeful conduct would show at least deliberate indifference, an inmate satisfies her burden to make that showing if she demonstrates that the defendant acted or failed to act despite having knowledge that her actions or inaction…would subject the inmate to a substantial risk of serious harm.

*Chavarriaga*, 806 F.3d at 227 (citing *Farmer*, 511 U.S. at 834 – 842) (internal citations omitted).

"To act with deliberate indifference to serious medical needs is to recklessly disregard a substantial risk of serious harm." *Giles v. Kearney,* 571 F.3d 318, 330 (3d Cir. 2009). To act with deliberate indifference, the prison official must have known of the substantial risk of serious harm and must have disregarded that risk by failing to take reasonable measures to abate it. *Farmer,* 511 U.S. at 837. "[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* Deliberate indifference, "like any other form of scienter," can "be proven through circumstantial evidence and witness testimony." *Pearson*, 850 F.3d at 535.

The mere misdiagnosis of a condition or medical need, or negligent treatment provided for a condition, however, is not actionable as a constitutional claim because medical malpractice is not a constitutional violation. *See Farmer,* 511 U.S. at 835 (holding that "deliberate indifference describes a state of mind more blameworthy than negligence")*; Spruill v. Gillis,* 372 F.3d 218, 235 (3d Cir. 2004) ("Allegations of medical malpractice are not sufficient to establish a Constitutional violation."); *Singletary v. Pa. Dep't of Corr.,* 266 F.3d 186, 192 n. 2 (3d Cir. 2002) (claims of medical malpractice, absent evidence of a culpable state of mind, do not constitute deliberate indifference under the Eighth Amendment). Instead, deliberate indifference represents a much higher standard, one that requires "obduracy and wantonness, which has been likened to conduct that includes recklessness or a conscious disregard of a serious risk." *Rouse,* 182 F.3d at 197 (quoting *Whitley v. Albers,* 475 U.S. 312, 319 (1986)).

"Indeed, prison authorities are accorded considerable latitude in the diagnosis and treatment of prisoners." *Durmer v. O'Carroll,* 991 F.2d 64, 67 (3d Cir. 1993) (citations omitted).  And courts will "disavow any attempt to second guess the propriety or adequacy of a particular course of treatment . . . [which] remains a question of sound professional judgment." *Palakovic v. Wetzel*, 854 F.3d 209, 228 (3d Cir. 2017) (quoting *Inmates of Allegheny County Jail v. Pierce*, 612 F.2d 754, 762 (3d Cir. 1979)).  "Mere disagreement as to the proper medical

treatment does not support an Eighth Amendment claim." *Caldwell v. Luzerne Cnty. Corr. Facility Mgmt. Employees*, 732 F.Supp.2d 458, 472 (M.D. Pa. 2010). Thus, "[w]here a prisoner has received some amount of medical treatment, it is difficult to establish deliberate indifference, because prison officials are afforded considerable latitude in the diagnosis and treatment of prisoners." *Palakovic*, 854 F.3d at 227. "Nonetheless, there are circumstances in which some care is provided yet it is insufficient to satisfy constitutional requirements." *Id*.

The Third Circuit has found deliberate indifference where a prison official: "(1) knows of a prisoner's need for medical treatment but intentionally refuses to provide it; (2) delays necessary medical treatment based on a non-medical reason; or (3) prevents a prisoner from receiving needed or recommended medical treatment." *Rouse,* 182 F.3d at 197. The Third Circuit has also held that "[n]eedless suffering resulting from the denial of simple medical care, which does not serve any penological purpose, . . . violates the Eighth Amendment." *Atkinson v. Taylor,* 316 F.3d 257, 266 (3d Cir. 2003). "For instance, prison officials may not, with deliberate indifference to the serious medical needs of the inmate, opt for 'an easier and less efficacious treatment' of the inmate's condition." *Palakovic*, 854 F.3d at 228 (quoting *West v. Keve*, 571 F.2d 158, 162 (3d Cir. 1978)). "Nor may 'prison authorities deny reasonable requests for medical treatment . . . [when] such denial exposes the inmate to undue suffering or the threat of tangible residual

injury.'" *Id*. (quoting *Monmouth Cnty. Corr. Institutional Inmates v. Lanzaro*, 834 F.2d 326, 346 (3d Cir. 1987)).  Thus, "[a] 'failure to provide adequate care . . . [that] was deliberate, and motivated by non-medical factors' is actionable under the Eighth Amendment, but 'inadequate care [that] was a result of an error in medical judgment' is not." *Parkell v. Danberg*, 833 F.3d 313, 337 (3d Cir. 2016) (quoting *Durmer,* 991 F.2d at 69).

Moreover, "there is a critical distinction 'between cases where the complaint alleges a complete denial of medical care and those alleging inadequate medical treatment.'" *Pearson*, 850 F.3d at 535 (quoting *United States ex. rel. Walker v. Fayette Cty.*, 599 F.2d 573, 575 n.2 (3d Cir. 1979)).  "Because 'mere disagreement as to the proper medical treatment' does not 'support a claim of an eighth amendment violation,' when medical care is provided, we presume that the treatment of a prisoner is proper absent evidence that it violates professional standards of care." *Id*. (quoting *Monmouth Cty. Corr. Inst.*, 834 F.2d at 346).  And "there are two very distinct subcomponents to the deliberate indifference prong of an adequacy of care claim." *Id*. at 536.  "The first is the adequacy of the medical care—an objective inquiry where expert testimony could be helpful to the jury." *Id*.  "The second is the individual defendant's state of mind—a subjective inquiry that can be proven circumstantially without expert testimony." *Id*.  But a claim that medical care was delayed or denied completely "must be approached differently

than an adequacy of care claim." *Id.* at 537.  "Unlike the deliberate indifference

prong of an adequacy of care claim (which involves both an objective and

subjective inquiry), the deliberate indifference prong of a delay or denial of

medical treatment claim involves only one subjective inquiry—since there is no

presumption that the defendant acted properly, it lacks the objective, propriety of

medical treatment, prong of an adequacy of care claim." *Id.*  "All that is needed is

for the surrounding circumstances to be sufficient to permit a reasonable jury to

find that the delay or denial was motivated by non-medical factors." *Id.*

Further, in the context of § 1983 medical care claims, "correctional health

care administrators and nurse supervisors are generally considered non-medical

personnel.  As a general rule, non-medical prison officials are not deliberately

indifferent under the Eighth Amendment simply because they failed to respond

directly to the medical complaints of a prisoner who was already being treated by

the prison doctor or because they deferred to the judgment of the medical staff

treating the inmate." *Dunyan v. Pennsylvania Department of Corrections*, No.

1:16-cv-02103, 2017 WL 3509243, at *7 (M.D. Pa., 2017) (citing *Durmer v.

O'Carroll*, 991 F.2d 64, 68 (3d Cir. 1993)).  "Absent a reason to believe (or actual

knowledge) that prison doctors or their assistants are mistreating (or not treating) a

prisoner, a non-medical prison official . . . will not be chargeable with the Eighth

Amendment scienter requirement of deliberate indifference." *Spruill*, 372 F.3d at

236.  "[T]he same division of labor concerns that underlie that rule apply when a nurse knows that a prisoner is under a physician's care and has no reason to believe that the doctor is mistreating the prisoner." *Pearson*, 850 F.3d at 540 n.4.  "Given that it is the physician with the ultimate authority to diagnose and prescribe treatment for the prisoner, a nurse who knows that the prisoner is under a physician's care is certainly 'justified in believing that the prisoner is in capable hands,' … so long as the nurse has no discernable basis to question the physician's medical judgment." *Id*. (internal citations omitted) (quoting *Spruill*, 372 F.3d at 236).  "[I]f, however, non-medical prison personnel had 'a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner,' liability may be imposed."  *Estein v. Showalter*, Civ. No. 1:13-cv-02474, 2017 WL 4310188, at * 21 (M.D. Pa. 2017) (quoting *Spruill*, 372 F.3d at 236).

### 1.  Dr. Moclock.

We do not construe Dr. Moclock as moving for summary judgment on the basis that Serrano's medical needs were not objectively serious.  Rather, Dr, Moclock argues that the evidence fails to show that he was deliberately indifferent to Serrano's serious medical needs.  Dr. Moclock asserts that he is entitled to summary judgment because he "did not observe any seizure activity" in Serrano,

and Serrano "never utilized one of the many avenues available to him to complain of recurrent seizure activity." *Doc. 51* at 26.  Dr. Moclock further argues that he reasonably "used his medical judgment to determine that [Serrano's] seizure disorder was stable and he did not require medication." *Id.*  Also, per Dr. Moclock, Hickey cannot prevail on her § 1983 claim because she has not proven "but for" causation. *Id.* at 35.

Hickey contends that Dr. Moclock's motion for summary judgment should be denied because he chose "not to actively medically manage [Serrano's] seizure disorder" and the record "demonstrates an accumulation of infractions committed by" Dr. Moclock "all of which increased the risk of [Serrano's] death." *Id.* at 11-14.  Hickey further asserts that summary judgment is inappropriate because there exist genuine issues of material fact regarding whether Dr. Moclock "endorsed the practice of automatically approving the Nursing Evaluation Tool without assessing its merit." *Id.* at 16.

Eighth Amendment deliberate indifference claims, like professional malpractice claims, entail fact-specific inquiries, which involve credibility determinations, weighing of evidence and the drawing of inferences from the facts. And, when presented with several competing expert reports, as we have here, on summary judgment the court may not invade the functions of the jury in these matters.  Here, in addition to numerous disputes of material facts, the parties

present argument about the perceived deficiencies of each others' expert opinions and the relative strengths of their own experts' opinions.  The Court, however, simply may not determine whether plaintiff's or defendants' experts are more credible or persuasive.  Such determinations as to the credibility of the competing experts' opinions on whether Dr. Moclock deviated from the standard of care such that he was deliberately indifferent to Serrano's care are within the province of the fact-finder at trial.  "Where multiple experts have opined in good faith based upon their considerable experience and knowledge, and within the confines of their expertise, and their opinions are simply conflicting, there is little for a court to do but conclude that a material dispute of fact exists." *See, e.g., Phillips v. Cohen,* 400 F.3d 388, 399 (6th Cir. 2005) ("This approach of weighing the credibility of the competing expert reports amounts to improper fact-finding.").  These profound factual disputes, therefore, are fatal to Dr. Moclock's motion for summary judgment, which we will deny.

### 2. Merritt-Scully.

Merritt-Scully also does not argue that Serrano's medical needs were not objectively serious.  Rather, she contends that summary judgment is appropriate as to Hickey's Eighth Amendment claim because she cannot be found to have been deliberately indifferent.  Per Merritt-Scully, she is not a medical provider, she was

justified in deferring to Dr. Moclock's treatment, she lacked personal involvement in Serrano's care, and she could not have been subjectively deliberately indifferent. *Doc. 53* at 5-8, 10-12.  In response, Hickey argues that Merritt-Scully was personally involved and subjectively deliberately indifferent because Hickey called her on at least two occasions to relay her concerns about Serrano's medication and seizure complaints. *Doc. 63-1* at 8-11; *see also doc. 49-16* at 19-21 ("I told her what [Serrano] told me, about the food trays, about the fact that he told me he was having seizures and was only taken to the infirmary once and was still not being given his medication . . . She told me that—she assured me that he would be given his medication.").

 Hickey also argues that Merritt-Scully's endorsement and automatic approval of the erroneous treatment records, specifically the Nursing Evaluation Tool, further establishes her personal involvement and deliberate indifference. *Id.* at 14-16.  Finally, Hickey argues that her expert testimony sufficiently establishes causation at the summary judgment stage. *Doc. 63-1* at 21-23.

Here material issues of fact surround Hickey's calls to Merritt-Scully regarding her son's medical care.  Merritt-Scully's argument that her role was limited to administrative duties, and did not involve her making medical judgments, does not automatically exclude her from constitutional liability.  This is especially true, whereas here, she may have had some reason to believe, based on

Hickey's phone calls, that Serrano was being mistreated with regard to his medical treatment. *See Barkes v. First Correctional Medical, Inc.*, 766 F.3d 307, 329 (3d Cir. 2014), *rev'd on other grounds sub nom. Taylor v. Barkes*, 575 U.S. 822 (2015) (per curiam) ("*Spruill* gives 'fair warning' . . . that nonmedical prison officials may 'be chargeable with the Eighth Amendment *scienter* requirement of deliberate indifference' when they possess actual knowledge or have reason to believe that prison medical staff are mistreating or failing to treat inmates' serious medical conditions.") (quoting *Spruill*, 372 F.3d at 236); *Flanyak v. Hopta,* 410 F.Supp.2d 394, 404 (M.D. Pa. 2006) (citing *Spruill* for the proposition that a nonmedical supervisor may be liable under § 1983 if he had knowledge or reason to know of medical mistreatment).  Hickey's assertions, if found credible, that she called the prison twice and spoke with Merritt-Scully about Serrano's medication and seizures could persuade a reasonable jury that Merritt-Scully had "reason to believe (or actual knowledge) that prison doctors or their assistants" mistreated or did not treat Serrano, or a "discernable basis to question the physician's medical judgment" sufficient to satisfy the subjective component of deliberate indifference. *Pearson*, 850 F.3d at 540 n.4 (quoting *Spruill*, 372 F.3d at 236).  We therefore deny Merritt-Scully's motion for summary judgment on Hickey's Eighth Amendment claim.

### 3. Nurse Kerr's Motion for Summary Judgment.

In support of her motion for summary judgment Nurse Kerr argues that the record does not support that she had the requisite state of mind necessary to find that she was deliberately indifferent to Serrano's serious medical needs. *Doc. 53* at 10-12. Hickey retorts that Nurse Kerr incorrectly documented Serrano's purported seizure on April 20, 2016, which amounts to deliberate indifference (*doc. 63-1* at 11-14), but she does nothing to explain how Nurse Kerr was "aware of facts from which the inference could be drawn that a substantial risk of serious harm exist[ed], and . . . also dr[e]w the inference." *Farmer*, 511 U.S. at 837; *see also Durmer v. O'Carroll*, 991 F.2d 64, 69 (3d Cir. 1993) (instructing that deliberate indifference is a subjective state of mind).

Nothing in this record establishes that Nurse Kerr actually knew about Serrano's history of seizures or head trauma or a substantial risk of harm related to them, nor does the record establish that Nurse Kerr drew an inference that a substantial risk of harm to Serrano existed. *See Farmer*, 511 U.S. at 837. Nurse Kerr testified at her deposition that she did not have access to older inmate medical records, which were stored in an archive, and the records to which she did have access "do not leave Medical" when she responded to a call. *Doc. 44-26* at 9. Although the record is wholly undeveloped on this issue, it appears that less recent medical information was not readily accessible to Nurse Kerr since she "didn't

35

know where those [were]." *Id.*  She did, however, have access to more recent

medical records "off of the computer," and she consulted Serrano's computer

records prior to filling out her report on April 20, 2016. *Id.* at 15-16; *see also doc.*

*44-25* at 39-40.  Whatever inconsistencies may have existed on the April 20, 2016

Nursing Evaluation Tool filed out by Nurse Kerr, she testified that her only

knowledge of Serrano's medical history came from the electronic medical record

which only has "their most recent history." *Doc. 44-26* at 16 ("Q: So you came to

the conclusion that he did not have epilepsy because of your review of the EMAR

[electronic medical record]?  A: Of his history, yes.").  She also testified that she

wrote "no seizure medication" because Serrano "wasn't taking any" according to

the computer. *Id.* at 17.  In short, and again based on this record, it is not possible

that Nurse Kerr consciously disregarded something which she never knew in the

first instance.  Thus, given that Nurse Kerr did not know about Serrano's

underlying seizure disorder, it was not possible for her to be deliberately

indifferent to serious medical needs based upon it.  We therefore grant summary

judgment to Nurse Kerr as to Hickey's Eighth Amendment claim against her.


### C. Supervisory Liability, Failure to Train, Supervise, and Discipline.

Hickey also claims that Dr. Moclock and Merritt-Scully are liable under §

1983 for failure to train, supervise, and discipline in connection their approval of

the Nursing Evaluation Tool completed by Nurse Kerr on April 20, 2016 when she responded Serrano's cell.  Supervisory liability and failure to train claims are judged against exacting legal standards.  In considering claims brought against supervisory officials arising out of alleged constitutional violations, the courts recognize that prison supervisors may be exposed to liability for the unconstitutional acts of their subordinates only in certain, narrowly defined, circumstances.  At the outset, it is clear that liability in § 1983 cases cannot be predicated on a *respondeat superior* basis.  The Third Circuit has "recognized that 'there are two theories of supervisory liability, one under which supervisors can be liable if they established and maintained a policy, practice or custom which directly caused the constitutional harm, and another under which they can be liable if they participated in violating plaintiff's rights, directed others to violate them, or, as the persons in charge, had knowledge of and acquiesced in their subordinates' violations.'" *Parkell*, 833 F.3d at 330 (quoting *Santiago v. Warminster Twp.*, 629 F.3d 121, 129 n.5 (3d Cir. 2010)).  "'Failure to' claims—failure to train, failure to discipline, or, as is the case here, failure to supervise—are generally considered a subcategory of policy or practice liability." *Barkes*, 766 F.3d at 316.

To succeed on a claim for supervisory liability under the policy and practice strand of supervisory liability, a plaintiff must establish the following:

> The plaintiff must identify a supervisory policy or practice that the supervisor failed to employ, and then prove that: (1) the policy or procedures in effect at the time of the alleged injury created an unreasonable risk of a constitutional violation; (2) the defendant-official was aware that the policy created an unreasonable risk; (3) the defendant was indifferent to that risk; and (4) the constitutional injury was caused by the failure to implement the supervisory practice or procedure.

*Id*. at 317 (citing *Sample v. Diecks*, 885 F.2d 1099, 1118 (3d Cir. 1989)); *see also*

*Brown v. Muhlenberg Twp.*, 269 F.3d 205, 216 (3d Cir. 2001).

The parties' briefs give short shrift to their arguments regarding these "failure to" claims, and the record is undeveloped as to the facts supporting this claim. Regardless, we will grant summary judgment on these claims. Sectional 1983 supervisory liability is predicated on the commission of an underlying constitutional violation by the untrained/unsupervised employee. Here, we have dismissed Hickey's Eighth Amendment claim against Nurse Kerr. Thus, even assuming that Dr. Moclock and Merritt-Scully failed to train and/or supervise Nurse Kerr, these transgressions would not support a claim for deliberate indifference because there has been no underlying constitutional tort on the part of Nurse Kerr proven here. *See Snatchko v. Peters Twp.*, No. 2:12-cv-1179, 2013 WL 1748342, at *4 (W.D. Pa. Apr. 23, 2013) (finding in the context of a *Monell* failure to supervise claim that "[a]xiomatically, Plaintiff cannot establish any *Monell* liability against Defendant Peters Township absent an underlying constitutional

violation."); *Verbanik v. Harlow*, CIV.A. 09-448, 2012 WL 4378198, at \*9 (W.D.

Pa. Sept. 25, 2012), *aff'd,* 512 F.App'x. 120 (3d Cir. 2013) ("Of importance,

however, is the absence of an underlying constitutional violation precludes

any supervisory liability on a 'knowledge or acquiescence' or 'failure to train'

theory.") (citations omitted).

### D.    Merritt-Scully is not entitled to sovereign immunity.

Merritt-Scully argues that summary judgment should be granted on Hickey's

professional negligence claim because she enjoys sovereign immunity as a

Commonwealth employee.[10] *Doc. 53* at 8-9, 12-14.  Hickey responds by arguing

that Merritt-Scully falls within the medical-professional liability exception to

sovereign immunity under 42 Pa. C.S. § 8522(b)(2). *Doc. 63-1* at 17-18.  As

several of my colleagues have observed, "[t]he Pennsylvania courts have not

uniformly decided whether prison health care administrators qualify as 'health care

personnel,' so as to be exempted from sovereign immunity." *Abu-Jamal v.*

*Kerestes*, No. 3:15-cv-967, 2016 WL 4204544, at \*11 (M.D. Pa. Aug. 5, 2016)

(citing *Milliner v. Diguglielmo*, No. 08-cv-4905, 2014 WL 413873, at \*7 n.67

(E.D. Pa. Jan. 31, 2014) (collecting cases)).

---

[10]   We assume the reference in her brief to "11th Amendment Immunity" is
an oversight.

But courts within the Third Circuit have held that a health care administrator qualifies as health care personnel when their duties are sufficiently similar. *See Lee v. Corizon Health, Inc.*, No. 1:16-cv-2154, 2020 WL 4005638, at *8 (M.D. Pa. Jan. 14, 2020) *report and recommendation adopted*, 2020 WL 4003603 (M.D. Pa. July 15, 2020) ("Steinhart, as an official who manages the health care services program, ensures contractual compliance, and answers healthcare-related inmate grievances, also qualifies as health care personnel."); s*ee also Milliner*, 2014 WL 413873 at *7 (holding that a prison health care administrator qualified as health care personnel when his duties included ensuring that the healthcare contractor fulfilled its contractual obligation, overseeing records departments, responding to grievances, and reviewing medical records in response to grievances).

Here, we find that, based on the record before us, Merritt-Scully's duties were similar enough to that of health care personnel such that she does not enjoy sovereign immunity as to Hickey's professional negligence claim.  In her deposition, Merrit-Scully testified that her position at SCI Coal Twp. is a "Corrections Health Care Administrator." *Doc. 49-7* at 4.   Regarding her duties, she says she is responsible for the "managerial and administrative functions of the Medical Department … [s]ome of the things I do are report writing, statistical reports, overtime, budget planning, compliance with ACA standards, and policy review." *Id*.  Additionally, Merrit-Scully states that part of her duties and

responsibilities is to oversee the performance of the nursing staff. *Id*. at 5.  Based on Merrit-Scully's deposition, her duties are not solely administrative and extend to ensuring that the medical staff at SCI Coal Twp. provides appropriate care to prisoners, which is sufficient to consider her health care personnel. *See Milliner*, 2014 WL 413873 at *7 ("[T]he Court concludes that his duties were not purely administrative, but instead extended to ensuring that PHS's employees provided appropriate care to prisoners.").

Moreover, Pennsylvania courts have frequently determined that corrections health care administrators fall within the medical-professional exception to sovereign immunity under 42 Pa. C.S. § 8522(b)(2). *Williams v. Syed*, 782 A.2d 1090, 1096 (Pa. Commw. Ct. 2001) ("[A] prison health care administrator is properly classified as a health care employee within the meaning of the medical professional liability exception to sovereign immunity.") (citing *Wareham v. Jeffes*, 564 A.2d 1314 (Pa. Commw. Ct. 1989)); *see also Watson v. Caleb*, No. 385 MDA 2019, 2019 WL 3763967, at *1 n.2 (Pa. Super. Ct. Aug. 9, 2019) (finding the chief health care administrator of a state prison fits the same sovereign immunity exception).  Thus, Merritt-Scully does not enjoy sovereign immunity as to Hickey's professional negligence claim.

## VI. Conclusion.

Based on the foregoing, we will grant in part and deny in part Dr. Moclock's motion for summary judgment (*doc. 43*), and grant in part and deny in part Merritt-Scully and Nurse Kerr's motion for summary judgment (*doc. 45*).  An appropriate order will issue.


<u>**S/Susan E. Schwab**</u>
Susan E. Schwab
United States Magistrate Judge